# O'Donnell v. Philadelphia Record

I. A. Pennypacker, J. D. M. Hamilton and T. E. Comber, Jr., for plaintiff.

L. B. Schofield, W. Bradley Ward, Thomas D. McBride, Laurence H. Eldredge and Fox, Rothschild, O'Brien & Frankel, for defendant.

GORDON, P. J., October 8, 1946.—In this action for libel brought by plaintiff, John O'Donnell, Washington correspondent of the New York Daily News and the Washington Times Herald, against the Philadelphia Record, in which the jury rendered a verdict for plaintiff in the sum of $25,000, we discharged defendant's rule for a new trial and dismissed its motion for judgment non obstante veredicto for the following reasons:

The suit arose out of an editorial published by defendant paper on April 18, 1941, in which several alleged libelous statements were made respecting plaintiff. For reasons which we need not discuss at this time the trial judge ruled, and, we think correctly, that only one of the statements complained of would support a charge of libel, that one being to the effect that plaintiff sympathized with the liquidation of the Jews in Germany by Hitler. The editorial in which this charge appeared in boldface type reads:

## " 'A DELIBERATE LIE'

"In the Daily News, of New York, and the Times-Herald, of Washington, appeared yesterday a story that United States warships were secretly convoying supply ships across the Atlantic.

"A few hours after the story appeared, the President denounced it as 'a deliberate lie'.

"The story was written by John O'Donnell, head of the Washington Bureau for the New York Daily News and Washington Times-Herald.

"*John O'Donnell is a Naziphile. He makes no secret of it. On numerous occasions, to all friends and barflies within hearing, he has broadcast his sympathy with most of Hitler's aims—such as destruction of the British Empire, suppression of labor unions and liquidation of Jews.*

"The Daily News has the largest circulation of any daily newspaper in America—nearly two million net paid. It is run by Joseph M. Patterson, recognized as one of the ablest publishers in America. The Washington Times-Herald is run by his sister, Mrs. Eleanore Patterson. It has the largest circulation of any newspaper in Washington. The two papers share the services of John O'Donnell.

"For many years, Mr. Patterson supported the Democratic Administration, but he broke with the President on his present foreign policy and has been a bitter opponent of the Lease-Lend bill and other measures to help the British.

"We do not criticize Mr. Patterson for opposing the President's policies. At a time like this, sincere opposition to Administration policy is a healthy element in our body politic.

"Also, Mr. Patterson and his sister are free to employ whomever they please to gather and interpret the news.

"But when opposition to the Administration resorts to what the President feels necessary to denounce as 'a deliberate lie,' then it also becomes right and proper that the public know the kind of man who is writing such news. Mr. O'Donnell feels so intensely on this subject that he may believe himself justified in resort-

ing to any means to block the Administration. At any rate, he is not an unbiased reporter.

"Mr. Patterson and his sister may feel that since the sympathies of an overwhelming majority of Washington correspondents are for Great Britain it is wise to employ as head of their Washington Bureau a man whose viewpoint is directly the other way.

"Perhaps they are right, but at times like these it is just as important for newspaper readers to know the character of Washington correspondents as it is to know the ownership of newspapers, which is required by law.

"Applying this requirement to ourselves, we hereby publicly confess that the head of our Washington Bureau, Robert S. Allen, is pro-Administration and for all-out aid to Britain. An experienced newspaperman, we believe Mr. Allen is doing his best to write objectively.

"At least, nothing he has written has been denounced by the Nazis as 'a deliberate lie'."

The trial judge ruled that no part of the editorial in question would support a charge of libel except that in which it charged, in effect, that plaintiff had repeatedly disclosed in conversations with others that he was in sympathy with most of the aims of Hitler, "including the liquidation of the Jews". This language, the trial judge ruled, was libelous per se, since at the time it was written, just before America entered the war, the word "liquidation" had acquired a definite and sinister meaning, not only in popular usage, but also in the publications of approved and authoritative lexicographers. Thus, in Webster's new and approved dictionary for the year 1939 "liquidation" is defined as meaning "to do away with by secret killing or to eradicate ruthlessly". When the article was written in 1941, therefore, the cruel and remorseless slaughter of the Jews by Nazi Germany had become a matter of

such common world knowledge that the word "liquidation" as used in the editorial definitely and unequivocally connoted inhuman and remorseless race extermination. The trial judge, therefore, did not err in taking judicial notice of this meaning of the word, and in instructing the jury that the accusation complained of was libelous per se in the following language:

"There was one other statement in what I read to you, however, which is open to a charge of being libelous, and that is where the article says that plaintiff was in sympathy with Hitler's liquidation of Jews. Now, as a mere abstract statement of a belief based upon an unworthy prejudice, there is nothing particularly libelous about that, but at that time there was sufficient common knowledge of what was being done by Hitler and the Nazis in Germany with respect to the Jews and others holding particular political or religious beliefs that the word 'liquidation' meant the wanton extermination or cruel oppression, in one form or another, of a people because they happened to be of a particular race or held a particular religious or political belief. Now, to the free Americans among whom this paper was published, that is an atrocious charge, especially if false and unjustified. To say that a man believes in exterminating fellow human beings because of their race naturally and inevitably holds him up to the hatred, ridicule and contempt of decent people, and unless such a charge is true or is made upon reasonable and probable cause, it is libelous in itself, and the law presumes that it inflicts injury upon the person against whom it is made. I therefore charge you that these particular words were libelous in themselves, because they imputed a baseness of character and a revolting attitude toward liberty and the sacredness of human life which one has no right to charge against another unless the charge either is true, or, if not true, the person making it has reason-

able and probable cause for believing it to be true. The article in that respect I charge you was libelous per se."

The trial judge also ruled, and we believe correctly, that the article was a privileged communication, and, hence, that no inference of malice arose from proof of the falsity of the charge, but that the existence of malice in the publication must be proved aliunde. Indeed defendant neither pleaded, nor attempted to prove, truth as a defense to the action, but rested its case solely on the pleas of privilege and reasonable and probable cause as a justification for making the charge. In support of these pleas defendant called a number of witnesses, all conceded by plaintiff to be reputable and well known Washington correspondents, to show that at various times, they had heard (and reported to J. David Stern, publisher of defendant paper and one of the authors of the article in question) plaintiff express opinions and sentiments respecting the treatment of Jews by Hitler and Nazi Germany, which, if communicated to defendant, the trial judge told the jury, furnished ample justification for the charge made in the editorial. Whether these witnesses did in fact so report to Mr. Stern, as testified to by him and by them, rested entirely upon his and their oral testimony, and it was upon this question that the liability of defendant ultimately turned. It was impossible, therefore, to give binding instructions for defendant, or to sustain its motion for judgment non obstante veredicto, in view of the well-settled rule that, where the proof of a fact rests entirely upon oral testimony, the credibility of the witnesses thereto is solely a question for determination by the jury trying the case: Holzheimer et ux. v. Lit Bros., 262 Pa. 150; Second National Bank of Pittsburgh v. Hoffman, 229 Pa. 429; Hartig v. American Ice Co., 290 Pa. 21; MacDonald, Admx., v. Pennsylvania Railroad Co., 348 Pa. 558. Although plaintiff did not, and in the circumstances

could not be expected to, offer direct evidence contradicting the evidence of defendant's witnesses that they had so told Mr. Stern, we think he was properly allowed, in answer to their testimony that he had in fact expressed the opinions they subsequently reported to Mr. Stern, to deny that he had ever done so. Although not direct, such testimony had, we think, some evidential value as going to the probable truth of the oral testimony of defendant's witnesses that they had so informed Mr. Stern.

It was also for the jury to decide, under proper instructions, which in this case we think were adequate and free from substantial error, whether the publication itself, in its tone and format, revealed such malice as robbed it of its privileged character. It was undoubtedly a vigorous and forceful arraignment of plaintiff as the holder and advocate of a social and governmental philosophy, which is at eternal and irreconcilable war with democratic principles and practices, and adherence to which has always been deemed a reproach by the great body of Americans to whom the article was addressed, and one of the attributes of an inferior and ignoble nature. The publication as a whole, therefore, was for the jury's consideration in ultimately deciding whether it had lost its privilege; and, although we would ourselves have found that it had not done so, the jury's conclusion to the contrary cannot be said to be so manifestly arbitrary and capricious as to require the verdict to be set aside as a matter of law.

Defendant rested its main contention in support of its motion for judgment non obstante veredicto upon a misunderstanding of the principle laid down in Briggs v. Garrett, 111 Pa. 404, in which Mr. Justice Paxon, affirming a judgment of nonsuit in the court below, invoked the rule that the law will not impute malice in a privileged communication to "one who hon-

estly acts upon information received from other reputable citizens", since "we are so accustomed to act in all the affairs of private life". Indeed, to hold otherwise in a judicial proceeding would establish a standard of reasonable and probable cause different from, and inconsistent with, the ordinary conduct of the average person. Defendant in that case had, in a campaign in which plaintiff was a candidate for judicial office, given some publicity to certain false and scandalous charges contained in a letter written by a former high public officer, and addressed to a committee of which defendant was chairman. Upon the information thus given by a *single* responsible person, the court held defendant was entitled to rely, and that the lower court properly granted the nonsuit. In attempting to apply this rule to the present case, defendant argued that, since plaintiff admitted on the stand that the witnesses called by defendant were reputedly reputable and accurate reporters, the trial judge was bound, as a matter of law, to accept as true and uncontradicted their testimony as to what they had communicated to Mr. Stern, and accordingly to give binding instructions in defendant's favor. The fallacies in this contention are, first, that plaintiff here was not bound by the testimony of his adversary's witnesses; and second, that it ignores the fact that the nonsuit affirmed in the Briggs case was entered upon what amounted to a demurrer to plaintiff's own evidence, by which he was bound. The rule invoked by Justice Paxon, the soundness of which is well recognized, and which the trial judge followed in his instructions to the jury, does not always justify a court in taking a case from the jury by a nonsuit or binding instructions. It is only when the facts upon which its application depends are, in one way or another, incontestably established that the rule would support a binding instruction to the jury. Had the Briggs case gone to the jury on evidence which, as here, rested on oral testimony produced by defend-

ant, it by no means follows that binding instructions for him would have been upheld by the Supreme Court. These considerations, we think, wholly eliminated·the Briggs case and those applying the same general rule as precedents controlling the question now before us.

It is principally for the foregoing reasons that we dismissed defendant's motion for judgment non obstante veredicto.

The case being one for the jury, our discharge of the motion for a new trial needs little comment. It was the second trial of the case, the first resulting in a verdict for $50,000, and this for $25,000. We have no way of telling from the record whether the jury heeded the trial judge's expressed opinion that the evidence did not warrant the award of punitive damage, and, therefore, whether the $25,000 awarded represents anything on that account. But whether it did or not, the amount of the verdict was, in our judgment, far beyond the utmost limit that either general or punitive damages, or both, would justify in the circumstances. Plaintiff neither pleaded nor attempted to prove special damage. Indeed, from the very nature of the case there can be little doubt that no special damages were suffered. The verdict awarded, therefore, was clearly excessive, and required either a new trial, or a radical reduction in amount. Nevertheless, the two verdicts already rendered strongly reflected the general gravity of the libel in the opinion of the average citizen as represented by both juries, and the court felt that nominal damages, which it might itself have awarded, would not reflect the degree of condemnation such a charge, if libelously false, was thus deemed by them to merit. What we might consider an excessive verdict does not necessarily imply an arbitrary or capricious disregard by the jury of its powers and duties in determining the basic question of liability. The trial of a case of this kind, involving, as it does, one of our fundamental liberties, demands that

special respect be accorded to the judgment of a jury of average persons in determining its abuse. There is no room in such a case for a strict application of technical legal rules; and after two juries have passed upon the subject their judgment should prevail.

The trial judge was impressed by plaintiff's obvious quibbling, evasions, and his manifest want of sincerity and veracity, and was utterly unable to credit his professed freedom from violent and odious anti-Semitic sentiments and predilections. Had this been the only trial of the case, we would have acted well within our discretion in directing its submission to another jury, as was done after the first trial. We prefer, however, to accede to the judgment of two juries upon the fundamental question of liability, and to confine the exercise of our discretionary powers to keeping the amount of the verdict within reasonable bounds, in the light of all the evidence. The discretion of a court to grant as many new trials as may be necessary to bring about a verdict acceptable to it is not an absolute discretion, resting upon the personal judgment of the individual judge. It is a judicial discretion, which is limited by a proper recognition of the jury's function to determine factual matters; and when two juries have spoken so decisively upon the question, their judgment is not to be lightly ignored.

The $8,000 to which we ordered the verdict reduced, on condition that plaintiff voluntarily accept the lower sum, represents the limit that the case will bear in both compensatory and punitive damages. This ruling favored defendant, and once plaintiff has voluntarily accepted and acted upon it, defendant is in no position to complain that the reduction should have been greater. We think the case was submitted to the jury fairly and without substantial error in a charge which cannot be said to have favored plaintiff over defendant. Defendant has twice failed to justify the publication on the ground of reasonable and probable cause, and we are

not inclined to order a third trial in the hope that another jury will see eye to eye with the trial judge on the question of liability. There must be some rest to litigation, and the point has been reached in this case at which the conclusion of legal liability reached by two juries should be allowed to stand.

It was for the foregoing reasons that we overruled the motion for judgment non obstante veredicto and discharged the rule for a new trial upon the filing of the remittitur by plaintiff.